**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
                                                              :
STEPHANIE M. FINCH,                                          :
                                    Plaintiff,               :
                  -against-                                  :          17-CV-892 (OTW)
                                                              :
                                                              :               **ORDER**
                                                              :
                                                              :
NANCY A. BERRYHILL, Acting Commissioner                      :
of Social Security,                                          :
                                    Defendant.               :
                                                              :
------------------------------------------------------------x

        **ONA T. WANG, United States Magistrate Judge:**

   I.   **Introduction**

        Plaintiff brings this action pursuant to section 205(g) of the Social Security Act, 42 U.S.C.

§405(g), seeking judicial review of a final decision of the Commissioner of Social Security

("Commissioner") denying her application for supplemental security income ("SSI") and

disability insurance benefits ("DIB"). Both Plaintiff and the Commissioner have moved for

judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (ECF

14, ECF 19). For the reasons set forth below, Plaintiff's Motion for Judgment on the

Administrative Record and Pleadings is **GRANTED** insofar as the case is **REMANDED** for further

proceedings, and the Commissioner's Motion for Judgment on the Pleadings is **DENIED**.[1]

  II.   **Statement of Facts**
        A.   **Procedural Background**

        Plaintiff applied for SSI and DIB on June 16, 2010, alleging that she became disabled on

April 1, 2009 due to the onset of cervical cancer and symptoms from subsequent radiation

---

[1] Both parties consented to magistrate judge jurisdiction pursuant to 28 U.S.C. §636(c). (ECF 18).

treatment. (Tr. 186-197, 239, 243, 717-729).[2] Plaintiff reported symptoms of chronic diarrhea, chronic pain, neuropathy,[3] and fatigue. (Tr. 243).

Plaintiff's applications were initially denied on September 30, 2009. (Tr. 107-09). After Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), ALJ Michael A. Rodriguez conducted a hearing on August 24, 2011, in which both Plaintiff and vocational expert Pat Green provided testimony. (Tr. 35, 173). On October 5, 2011, Judge Rodriguez issued a decision finding that Plaintiff was not disabled. (Tr. 18-34). The Appeals Council subsequently denied Plaintiff's request for review. (Tr. 8-11).

On June 18, 2013, the Appeals Council granted Plaintiff's request to submit new information. (Tr. 1). After considering the additional information, the Appeals Council again denied Plaintiff's request for review. (Tr. 700-03).

Plaintiff then filed an action for review in this Court, where Judge Gorenstein remanded the case to the Commissioner for a new hearing upon stipulation by the parties. *See Finch v. Colvin*, No. 14-CV-720 (AT) (GWG) (S.D.N.Y. Sept. 25, 2014); (Tr. 837-39). Pursuant to the remand order, on March 14, 2016, ALJ Kieran McCormack held a hearing where Plaintiff testified as to her limitations caused by her impairment. (Tr. 739-800). At that hearing, ALJ McCormack also heard from vocational expert Michelle Erbacher, who opined that while there existed sedentary work in the national economy, no employer would hire an applicant who required breaks consuming more than fifteen percent of the work-day. *Id*. ALJ McCormack held a

---

[2] Only the facts relevant to the Court's review are set forth here. Plaintiff's medical history is contained in the administrative record that the Commissioner filed in accordance with 42 U.S.C. § 405(g). (*See* Administrative Record, dated July 27, 2017, ECF 11 ("Tr.")).

[3] Neuropathy is a functional disturbance of pathological change in the peripheral nervous system typically linked to diabetes. *Dorland's Illustrated Medical Dictionary,* 1268 (32nd ed. 2012).

supplementary hearing on August 29, 2016 at the request of Plaintiff's counsel to examine Ms. Erbacher further on existing jobs related to Plaintiff's particular limitations. (Tr. 801-19). On October 11, 2016, ALJ McCormack issued a decision finding that Plaintiff was not disabled. (Tr. 714-29). As Plaintiff did not file written exceptions and the Appeals Council did not *sua sponte* review the decision, the Commissioner's decision became final on December 11, 2016. (Tr. 714-16).

### B.  Social Background

Plaintiff was born in 1973 and was 35 years old at her alleged disability onset date. (Tr. 105-06). Plaintiff has a General Education Diploma. (Tr. 244). From 1989 until 2004, she worked in retail in various part-time positions, shelving products, writing receipts, and handling the register. (Tr. 262, 264). From May 2004 until July 2007, Plaintiff worked full-time as a shipping clerk. (Tr. 262, 746). At that job, she lifted objects up to 100 pounds as well as performed occasional inventory and ship label entry on a computer. (Tr. 265, 746-47). Plaintiff quit her shipping clerk job a month after she was diagnosed with cervical cancer because the work was too physically demanding. (Tr. 56, 262). In April 2009, she attempted to rejoin the workforce as a cashier in retail but was forced to quit in May 2009 due to pain from the effects of her radiation treatment. (Tr. 57, 262).

In 2011, Plaintiff lived in an apartment with her fiancé and 12-year-old son. (Tr. 44). Plaintiff at that time was also in the process of seeking a divorce from her husband, her son's father. (Tr. 46). However, Plaintiff's fiancé passed away in 2013, and Plaintiff moved with her son to a bungalow that she rented from her parents, who lived close by. (Tr. 779-80).

Before being diagnosed with cancer, Plaintiff was an active individual who enjoyed bowling, swimming, and crafts. (Tr. 256). Now, Plaintiff primarily stays at home and watches TV due to needing to be close to a bathroom at all times. (Tr. 256-57). Plaintiff is fearful of being out in public because she has 10-15 bowel movements a day and experiences public accidents. (Tr. 776-82). She must be accompanied by an adult to drive and help her along for all outings. (Tr. 779-80). Plaintiff's son has also begun to help with chores in and around the home. (Tr. 780). During the day, Plaintiff typically stays at home and talks with friends on the phone or watches television. (Tr. 772-74). When walking around the house, Plaintiff often must lean on an object because she is unable to support her own weight for long due to fatigue and pain. (Tr. 773). While cooking, Plaintiff must ensure someone else is home to take over in case an emergency bowel movement takes her away from the stove. (Tr. 254). Plaintiff also experiences trouble sleeping because of excruciating pain and frequent trips to the bathroom. (Tr. 775).

### C. Medical Background

#### 1. Medical Evidence Prior to Alleged Disability Onset Date of April 1, 2009

##### a. Diagnosis of Cancer – Memorial Sloan Kettering Hospital (2007)

In 2007, Plaintiff began experiencing symptoms of cervical cancer such as pain and dizziness. (Tr. 57). After an episode of post-coital bleeding, Plaintiff visited Memorial Sloan Kettering Hospital Emergency Room in August 2007 and was referred for a Pap smear. (Tr. 482). The Pap smear returned positive for high-risk HPV, after which Plaintiff was referred for a

colposcopy.[4] *Id*. The colposcopy, performed at a Planned Parenthood in New York, revealed evidence of cervical cancer. *Id*.

Plaintiff saw Dr. Carol Brown at Memorial Sloan Kettering Hospital on October 4, 2007 for further evaluation. (Tr. 480-94). Dr. Brown diagnosed Plaintiff with probable stage IIB squamous cell carcinoma of the cervix, barrel shaped cervix, and possible stage IB-2 barrel shaped squamous cell carcinoma[5] of the cervix. (Tr. 483). Further examination revealed an 8 cm diameter hard mass replacing the anterior vaginal portion of the cervix and a clear extension of the mass into the intrapelvic portion of the cervix. *Id*. On October 12, 2007, a CT scan and PET scan both confirmed the cervical mass as well as the likely presence of hemorrhagic or proteinaceous cysts.[6] (Tr. 490, 492). Dr. Brown recommended radiation treatment and chemotherapy with chemo-sensitizing doses of Cisplatin combined with external beam radiation therapy and intravaginal high dose rate brachytherapy. (Tr. 484).[7]

### b. Medi-Port Insertion – Dr. Yacoub (2007)

On November 6, 2007 a radiation device was successfully inserted by Dr. Makeen Yacoub into Plaintiff's right subclavian vein as part of the chemotherapy treatment. (Tr. 310-11). Patient reacted well to the procedure without complications. (Tr. 311).

---

[4] Colposcopy is an examination of the cervix and vagina by means of the colposcopy. *Dorland's Illustrated Medical Dictionary,* 389 (32nd ed. 2012).

[5] Carcinoma is a malignant new growth made up of epithelial cells tending to infiltrate the surrounding tissues and give rise to metastases. *Dorland's Illustrated Medical Dictionary,* 290 (32nd ed. 2012).

[6] A proteinaceous cyst is a closed cavity on top of a single bone containing a liquid or semisolid. *Dorland's Illustrated Medical Dictionary,* 458-59 (32nd ed. 2012).

[7] Brachytherapy is radiation treatment where the radiation source is implanted within the body, applied to the body's surface, or located a short distance from the body area being treated. *Dorland's Illustrated Medical Dictionary,* 244 (32nd ed. 2012).

### c. Radiation and Chemotherapy Treatment – Orange Regional Medical Center's Department of Radiation Oncology (2007 – 2008)

On November 5, 2007, Plaintiff visited Dr. Emelito Gonzales for treatment related to her carcinoma. (Tr. 506). From November 5, 2007 until December 18, 2007, Plaintiff completed a course of external beam radiation therapy, which resulted in significant reduction in the size of her cervical tumor. (Tr. 507). From December 7, 2007 to January 4, 2008, Plaintiff completed five brachytherapy applications. (Tr. 509).

Plaintiff's radiation oncologist, Dr. Arvind G. Kamthan, wrote in a progress note of March 24, 2008 that after completing the first round of chemotherapy and radiation treatment, Plaintiff was "presently feeling very well except occasional discomfort in the lower pelvis." (Tr. 339). Dr. Kamthan stated there was no sign of "progressive disease, [and] her response was excellent." *Id*. Dr. Kamthan instructed Plaintiff to maintain follow-up appointments with Dr. Gonzales and himself. *Id*.

In May 2008, Plaintiff checked in to Orange County Medical Center after complaints of pelvic pain. (Tr. 394). Three pelvic abscesses were identified. *Id*. Plaintiff was placed on a program of IV antibiotics for three weeks, but this failed to alleviate the symptoms. *Id*. On May 27, 2008, Plaintiff was transferred to St. Peter's Hospital. *Id*. Doctors there diagnosed Plaintiff with pelvic abscess and bowel obstruction. (Tr. 407). On June 6, 2008, Dr. Thomas P. Morrissey conducted an exploratory laparotomy[8] to identify irregularities within Plaintiff's pelvic and cervical regions. *Id*. During the operation, Dr. Morrissey removed two drains in the left pelvis,

---

[8] Laparotomy is surgery including incisions to the abdominal cavity. *Dorland's Illustrated Medical Dictionary,* 1005 (32nd ed. 2012).

performed a resection[9] on Plaintiff's ileum,[10] and created an anastomosis.[11] (Tr. 424). Dr.

Morrissey also diagnosed Plaintiff with cervical cancer and enteritis.[12] (Tr. 1413).

### 2.  Medical Evidence After Alleged Disability Onset Date of April 1, 2009

#### a.  Post-radiation Therapy Oncologist: Dr. Gonzales (2007 – 2010)

During routine follow ups in January and August 2009 respectively, Dr. Gonzales noted

that Plaintiff suffered from chronic diarrhea up to ten times per day. (Tr. 511, 522). He referred

Plaintiff to a gastroenterologist, but Plaintiff ultimately did not visit one due to insurance

coverage issues. (Tr. 511).

On August 31, 2009, Dr. Gonzales completed a questionnaire at the request of the New

York State Office of Temporary and Disability Assistance Division of Disability Determinations,

diagnosing Plaintiff with stage IIIB cervical cancer, symptoms of chronic dysuria,[13] hematuria,[14]

diarrhea, and hip and thigh pain. (Tr. 496). Dr. Gonzales also reported that Plaintiff was taking

Imodium AD for her diarrhea but had "poor control" over her symptoms. (Tr. 497). As a result,

Dr. Gonzales characterized Plaintiff's condition as a "permanent disability." (Tr. 499). Dr.

Gonzales indicated that he could not provide a medical opinion regarding the individual's ability

to carry out work-related activities. (Tr. 500).

---

[9] Resection is an excision of an obstructive portion or wedge. *Dorland's Illustrated Medical Dictionary,* 1626 (32nd ed. 2012).

[10] The ileum is the longest portion of the small intestine. *Dorland's Illustrated Medical Dictionary,* 914 (32nd ed. 2012).

[11] An anastomosis is the surgical creation of an opening betwen two normally separate spaces or organs. *Dorland's Illustrated Medical Dictionary,* 75 (32nd ed. 2012).

[12] Enteritis is damage to the small intestine by ionizing radiation. Symptoms include diarrhea, abdominal cramps, and nausea. *Dorland's Illustrated Medical Dictionary,* 624 (32nd ed. 2012).

[13] Dysuria is painful urination. *Dorland's Illustrated Medical Dictionary,* 585 (32nd ed. 2012).

[14] Hematuria is blood in the urine. *Dorland's Illustrated Medical Dictionary,* 834 (32nd ed. 2012).

On May 27, 2010, Dr. Gonzales reported in his notes that Plaintiff was still experiencing diarrhea up to fifteen times per day. (Tr. 570). In addition, Plaintiff reported experiencing occasional cramps and lower back pain radiating through her hips and thighs. *Id*. Dr. Gonzales suggested Plaintiff was suffering from a "herniated disc." *Id*.  Although Dr. Gonzales advised Plaintiff to see an orthopedic surgeon, Plaintiff stated that she may have difficulty finding one with her insurance coverage. *Id*.

### b.  **Oncologist and Gynecologist – Dr. Morrissey (2008-2011)**

In 2009, Dr. Morrissey completed a questionnaire about Plaintiff's condition at the request of the New York State Office of Temporary and Disability Assistance Division of Disability Determinations. (Tr. 453-58). Dr. Morrissey diagnosed Plaintiff with cervical cancer but noted that the only current symptom was enteritis. (Tr. 453). He marked that Plaintiff's condition imposed no limitations on her ability to lift, carry, push, pull, sit, stand, or walk. (Tr. 453, 457).

On January 12, 2010, Plaintiff saw Dr. Morrissey for a follow-up appointment about her pelvic cramping as well as recent panic attacks. (Tr. 630). In response, Dr. Morrissey prescribed Plaintiff a higher dosage of Colestipol. *Id*. At an April 2010 follow up, Plaintiff reported irregular bowel movements, difficulty sleeping, and chronic fatigue. (Tr. 633). A PET scan showed no areas of recurrent cervical cancer. (Tr. 636). In May 2010, Plaintiff reported hip, lower back, and abdominal pain to Dr. Morrissey. (Tr. 636). A CT scan from that visit revealed chronic pelvic changes, and bowel and bladder wall thickening. *Id*.

### c.  Gastroenterologist – Dr. Rosenzweig (2009 – 2010)

On April 4, 2009, Plaintiff started seeing a gastroenterologist, Dr. Robert Rosenzweig. (Tr. 589). At her first appointment, Dr. Rosenzweig noted Plaintiff was reporting up to fifteen bowel movements a day along with abdominal pain and cramps. (Tr. 428). He consequently diagnosed Plaintiff with probable choleretic diarrhea that was related to her earlier small bowel resection. (Tr. 429).

Dr. Rosenzweig prescribed Colestid to Plaintiff to control her bowel movements, which subsequently helped Plaintiff reduce the recurrence of bowel movements to five times per day (Tr. 427, 584). However, by a follow-up visit on September 29, 2009, Plaintiff's diarrhea had increased to ten episodes per day. (Tr. 583). Dr. Rosenzweig advised Plaintiff that she may have developed lactose intolerance. (Tr. 583). A small bowel x-ray examination showed a shortening of the bowel loops due to the prior resection but otherwise normal transit time and no evidence of obstruction. (Tr. 675). On April 27, 2010, Plaintiff showed limited progress, and Dr. Rosenzweig prescribed the antidepressant Pamelor. (Tr. 581). In July 2010, Dr. Rosenzweig reported that Plaintiff was "markedly better." (Tr. 580). By November 30, 2010, Dr. Rosenzweig noted that Plaintiff was experiencing one bowel movement per meal and diagnosed her with radiation induced damage to her gastrointestinal tract. (Tr. 670).

### d.  Mid-Hudson Urological (2009 – 2010)

On May 14, 2009, Plaintiff visited Mid-Hudson Urological Associates for treatment of her hematuria. (Tr. 680). There, Dr. Mark Chang identified a renal cyst based on a renal ultrasound and urinal cystoscopy. (Tr. 681). In June 2009, a flexible cystoscopy showed that Plaintiff had

gross hematuria, leading Dr. Chang to diagnose Plaintiff with hemorrhagic cystitis.[15] (Tr. 681). On July 2, 2009, Dr. Chang performed a bladder biopsy and found no evidence of carcinoma. (Tr. 682).

Dr. Paul Pomerantz assumed Plaintiff's treatment in August 2009 after Dr. Chang left Mid-Hudson Urological. (Tr. 479). On August 9, 2010, Dr. Pomerantz completed a questionnaire at the request of the New York State Office of Temporary and Disability Assistance Division of Disability Determinations, where he also diagnosed Plaintiff with gross hematuria. (Tr. 475-79). Based on that assessment, Dr. Pomerantz reported no limitations on Plaintiff's ability to lift or carry items of any weight, stand or walk for certain amounts of times, push or pull any objects, or any other limitation on her work-related physical activity. (Tr. 477-78).

On September 16, 2010, Plaintiff returned to Mid-Hudson for lower urinary tract symptoms and acute cystitis. (Tr. 682). Dr. Conrado Tojino, Jr. noted Plaintiff was suffering from bladder spasms and having to urinate up to ten times per day. *Id*. Dr. Tojino diagnosed Plaintiff with significant lower urinary tract symptoms as well as a history of chronic back and hip pain. *Id*. Dr. Tojino prescribed Toviaz and counseled Plaintiff on bladder training. *Id*.

### e.  Vassar Brothers Hospital (2010)

On February 11, 2010, Plaintiff went to the emergency room at Vassar Brothers Medical Center for severe pain in her pelvis, hips, and legs. (Tr. 546). Dr. Katrina Knowles ordered a CT scan of the abdomen and pelvic regions, which showed a thickened bladder wall and thickening of the rectosigmoid colon. (Tr. 555). The other attending physician, Dr. Yong Kwok, noted that Plaintiff's thickened bladder was consistent with cystitis, but he was unsure as to the cause. (Tr.

---

[15] Cystitis is inflammation of the urinary bladder. *Dorland's Illustrated Medical Dictionary,* 463 (32nd ed. 2012).

552). To address Plaintiff's pain, Dr. Knowles administered Morphine and Zofran injections and prescribed Levaquin and Percocet. (Tr. 557, 561). Dr. Knowles recommended that Plaintiff regularly follow-up with her regular physician, whom Plaintiff identified as Dr. Morrissey. (Tr. 567).

In May 2010, Plaintiff returned to the emergency room at Vassar Brothers Medical Center for severe lower abdominal pain and chronic diarrhea. (Tr. 525). A CAT scan revealed thickening of rectal and sigmoid colon walls as well as of the urinary bladder wall. (Tr. 534-35). Dr. Young prescribed Plaintiff Percocet. (Tr. 538).

###### f. Consultative Orthopedic Examiner - Dr. Malhotra (2010)

On September 22, 2010, Plaintiff visited Dr. Suraj Malhotra, upon referral by the Division of Disability Determination for an orthopedic examination. (Tr. 647). Dr. Malhotra noted Plaintiff's reports of lower back and hip pain that radiated into her legs. (Tr. 647). Dr. Malhotra also wrote that Plaintiff's pain worsened on prolonged sitting, standing, exercising, or climbing stairs. (Tr. 647). Plaintiff exhibited hip extension and rotational limitations due to abdominal and hip pain, and mild limitations in squatting and moving both hips. (Tr. 648-50). Dr. Malhotra performed an X-ray on Plaintiff's right hip but found no abnormalities. (Tr. 649). Dr. Malhotra diagnosed Plaintiff with lumbosacral spine region pain and recommended orthopedic treatment. (Tr. 649-50).

###### g. Physiatrist - Dr. Bodack (2010 – 2015)

On September 14, 2010, Plaintiff began treatment with Dr. Mark Bodack, a physiatrist, for hip, abdomen, and pelvic pain. (Tr. 643). In his first progress note, Dr. Bodack noted Plaintiff's pain in both her hips and abdomen, intermittently radiating to her thighs and legs

and occasionally causing numbness in her feet. *Id*. Plaintiff told Dr. Bodack that her current prescription for Roxicet was helping with the pain. *Id*. Dr. Bodack wrote that Plaintiff's pain worsens with prolonged sitting, standing, walking, and stair climbing. *Id*. He also noted that Plaintiff limps frequently and suffers from chronic abdominal pain. *Id*. A sensory exam on Plaintiff's lower back showed that Plaintiff's gait was slightly antalgic. (Tr. 644). Dr. Bodack diagnosed Plaintiff with bursitis in both hips, chronic pain syndrome, and leg length discrepancy. *Id*. He suggested Plaintiff get X-rays done on both hips to rule out degenerative joint disease and to limit her activities as tolerated. *Id*. Dr. Bodack also prescribed Percocet and Opana. *Id*.

On October 15, 2010, Plaintiff returned for corticosteroid injections in both hips. (Tr. 1088). Dr. Bodack noted that Plaintiff's pain seemed "more tolerable," but Plaintiff still had abdominal and pelvic pain. To help with the pain, he increased Plaintiff's Opana dosage, especially since Plaintiff reported that Opana was helping with her diarrhea. (Tr. 1088-89). Dr. Bodack again diagnosed Plaintiff with bursitis in both hips, chronic pain syndrome, and leg length discrepancy and advised Plaintiff to limit her activities. (Tr. 1088).

On January 17, 2011, Dr. Bodack saw Plaintiff for continued back, hip, and abdominal pain. (Tr. 1082). Dr. Bodack noted that the pain was radiating into her knees, causing her left foot to feel numb. *Id*. Dr. Bodack referred Plaintiff for a noncontrast lumbar spine MRI and suggested she try physical therapy. (Tr. 1083). Dr. Bodack further noted Plaintiff's complaints of depression, anxiety, and difficulties sleeping. (Tr. 1082).

On September 12, 2011, Plaintiff visited Dr. Bodack concerning her continued lower

back sacral[16] and hip pain (Tr. 1080 – 1081). Dr. Bodack recommended that Plaintiff should be screened for fibromyalgia[17] and referred her to a specialist for further treatment. (Tr. 1081). Dr. Bodack also noted that Plaintiff had been suffering from panic attacks. (Tr. 1080).

On December 12, 2011, Plaintiff saw Dr. Bodack for lower back pain along with radiating pain up and down her spine and legs. (Tr. 1078). Plaintiff reported to Dr. Bodack that her pain grew worse with increased activity, which increased her frustration and depression with her life situation. *Id*. Dr. Bodack prescribed Lidoderm for the pain, and recommended Plaintiff increase her current dosage of Opana and Percocet. (Tr. 1079).

On April 12, 2012, Plaintiff visited Dr. Bodack for the same lower back and sacral pain. (Tr. 1076). Plaintiff also reported morning stiffness and joint pains. *Id*. Dr. Bodack noted that Plaintiff was unable to lift light objects without difficulty. *Id*. Dr. Bodack prescribed Lyrica for the pain, and wrote that because of her chronic pain syndrome, Plaintiff remained "fully disabled and cannot work." (Tr. 1077).

On February 4, 2013, Dr. Bodack's notes state that Plaintiff's lower back and sacral pain had gotten worse, in addition to back spasms and joint pains. (Tr. 1074). Plaintiff speculated that the increased pain was due to her increase in household activity following her fiancé's death. *Id*. Dr. Bodack again concluded that Plaintiff remained "fully disabled and cannot work." (Tr. 1075).

---

[16] Sacrum is a triangular bone just below the lumbar vertebrae. *Dorland's Illustrated Medical Dictionary,* 1662 (32nd ed. 2012).
[17] Fibromyalgia refers to pain and stiffness in the muscles and joints. *Dorland's Illustrated Medical Dictionary,* 703 (32nd ed. 2012).

On April 15, 2013, Dr. Bodack saw Plaintiff for continued lower back, hip, thigh, and abdominal pain. (Tr. 1072). A recent MRI showed a broad-based disc bulge at the L5-S1 level, disc desiccation, and a superimposed control disc protrusion with some extrusion. (Tr. 1096). Dr. Bodack referred Plaintiff to St. Luke's-Cornwall Hospital for injections to address her low back and lumbar extension pain. (Tr. 1072-73). Dr. Bodack again stated that Plaintiff remained "fully disabled and cannot work." (Tr. 1073).

On October 8, 2013, Dr. Bodack noted that Plaintiff reported neck and upper back pain, as well as diffuse low back and sacral pain. (Tr. 1069). Upon examination, Dr. Bodack found that Plaintiff's ability to reach was limited by her back and shoulder pain and that the range of motion on her neck was greatly reduced. *Id*. Dr. Bodack again concluded that Plaintiff remained "fully disabled and cannot work" because of her chronic pain syndrome. (Tr. 1070).

Plaintiff returned to see Dr. Bodack on April 21, 2014 to review her January 2014 MRI results. (Tr. 1063, 1092). The MRI showed a broad-based left-sided disc protrusion, leading Dr. Bodack to prescribe Voltaren gel for the shifts in her spine. (Tr. 1064). Plaintiff reported that her pain was unchanged. (Tr. 1063).

On November 19, 2014, Plaintiff saw Dr. Bodack for a follow up visit. (Tr. 1060). Plaintiff complained that her pain was getting worse, and that she had difficulty standing. *Id*. Plaintiff also reported that she had to see a gastroenterologist for an endoscopy. *Id*. Again, Dr. Bodack wrote that Plaintiff remained fully disabled and could not work. (Tr. 1061).

On April 21, 2015, Plaintiff returned to Dr. Bodack after complaining that the pain was causing numbness in her hands. (Tr. 1057). While Plaintiff said the Voltaren gel helped provide

some relief, her shoulder pain had been increasing recently. *Id*. Again, Dr. Bodack opined that Plaintiff remained fully disabled and could not work. (Tr. 1058).

### h. Psychiatrist – Dr. Al-Tariq (2012 – 2015)

On November 6, 2012, Plaintiff began treatment with Dr. Quazi Al-Tariq, a psychiatrist, for anxiety and depression after Plaintiff suffered a nervous breakdown on October 5, 2012. (Tr. 1054). When his initial prescription of Cymbalta failed to show signs of success, Dr. Al-Tariq raised the dosage to combat Plaintiff's increasing levels of depression. (Tr. 1035). Dr. Al-Tariq also mentioned in his progress notes that Plaintiff was unable to work. *Id*.

Dr. Al-Tariq's August 8, 2013 notes indicate a continued diagnosis of depression with anxiety. (Tr. 1035 – 1056). On Plaintiff's last visit with Dr. Al-Tariq on March 6, 2015, Plaintiff was prescribed Risperdal, Ativan, Lamictal and Cymbalta. (Tr. 1035).

### i. Gastroenterologist – Dr. Minano (2013 – 2015)

On July 3, 2013, Plaintiff visited Crystal Run Healthcare to see Dr. Cecilia Minano, a gastroenterologist. (Tr. 1396-1402). Dr. Minano diagnosed Plaintiff with abdominal pain and chronic diarrhea. (Tr. 1396). Dr. Minano's notes state that Colestid was limited in helping control Plaintiff's diarrhea. *Id*. Dr. Minano also noted Plaintiff had rectal bleeding likely caused by hemorrhoids. (Tr. 1399). A CT scan of plaintiff's abdomen and pelvis showed defects on the anterior abdominal wall consistent with abdominal wall hernias, as well as a growing cyst. (Tr. 1321-22). Dr. Minano noted that these symptoms could all be related to Plaintiff's post-radiation enteritis. (Tr. 1322).

On September 9, 2013, Plaintiff returned to review her endoscopy and colonoscopy results. (Tr. 1310). The doctor who administered the two procedures, Dr. Elena Katzap,

diagnosed Plaintiff with gastritis and a hernia. (Tr. 1306). Upon reviewing the results, Dr.

Minano also found mild lymphocytosis[18] and hemorrhoids. (Tr. 1311). Dr. Minano prescribed

Plaintiff an antacid for mild stomach inflammation. (Tr. 1304).

On October 7, 2013, Plaintiff visited Dr. Minano for a follow-up appointment. (Tr. 1294).

Dr. Minano diagnosed Plaintiff with borderline diabetes, anxiety, bursitis, fibromyalgia, and a

herniated disc. (Tr. 1294-95). Dr. Minano also took note of the ineffectiveness of medication to

control Plaintiff's diarrhea. (Tr. 1294). On October 30, 2013, Plaintiff called Dr. Minano's office,

complaining of constipation. (Tr. 1289).

On April 4, 2014, Plaintiff visited Dr. Minano for abdominal pain, diarrhea, and nausea.

(Tr. 1279). Dr. Minano again diagnosed Plaintiff with borderline diabetes, anxiety, bursitis,

fibromyalgia, and a herniated disc. (Tr. 1280). After running several lab tests, Dr. Minano

suggested Plaintiff make monthly appointments for vitamin B shots. (Tr. 1275).

On May 27, 2014, Dr. Minano wrote to Plaintiff saying that the endoscopy showed no

change, but her stool tests showed some mild fat malabsorption, likely caused by Plaintiff's

prior surgeries. (Tr. 1271). On June 3, 2014, Plaintiff called Dr. Minano's office and said she felt

very weak despite completing a full month of vitamin B shots (Tr. 1270).

On February 24, 2015, Plaintiff visited Dr. Minano for hematuria. (Tr. 1227-28). A CT

scan of Plaintiff's abdomen and pelvis revealed a renal cyst, diverticulosis without

diverticulitis,[19] a mildly thickened urinary bladder wall, and no visible renal or ureteral calculi.

---

[18] Lymphocytosis is an excess of lymphocytes in the blood or in any effusion. *Dorland's Illustrated Medical Dictionary,* 1085 (32nd ed. 2012).

[19] Diverticulosis is inflammation of a circumscribed pouch occurring in the herniation of the lining mucous membrane through a defect in the muscular coat of an organ. *Dorland's Illustrated Medical Dictionary,* 558 (32nd ed. 2012).

(Tr. 1407-08). Dr. Minano suggested that Plaintiff's hematuria was most likely caused by Plaintiff's radiation treatment. (Tr. 1211).

### j. Psychologist - Dr. Helprin (2015)

In September 2015, Dr. Leslie Helprin performed a psychiatric evaluation of Plaintiff. (Tr. 1111- 18). Dr. Helprin wrote that Plaintiff had no limitations in her ability to follow and understand simple directions and instructions, perform simple and complex tasks independently, maintain attention and concentration for tasks, keep a regular schedule, make appropriate decisions, or relate adequately with others. (Tr. 1114). However, Dr. Helprin noted a mild limitation in dealing with stress because of Plaintiff's many ailments. *Id*. Dr. Helprin opined that Plaintiff's psychiatric problems did not significantly interfere with her daily functioning. *Id*.

Dr. Helprin also completed a medical source statement regarding Plaintiff's abilities at the request of the Social Security Administration's Office of Disability Adjudication and Review. (Tr. 1116-18). Dr. Helprin stated that Plaintiff's mental impairment did not affect her ability to understand instructions, interact appropriately with co-workers, or respond to routine changes in a work setting. (Tr. 1116-17). Dr. Helprin also found that Plaintiff was capable of managing benefits in her own interest. (Tr. 1118).

### k. Dr. Gaeta (2016)

ALJ Kieran McCormack requested Dr. Joseph Gaeta's independent evaluation of Plaintiff's condition based on a review of Plaintiff's medical records. (Tr. 1530-34). On March 21, 2016, Dr. Gaeta identified Plaintiff as suffering from cervical cancer, diarrhea following partial

rectum resection, and cervical and lumbar spine pain. (Tr. 1531-34). Dr. Gaeta then concluded

that Plaintiff's ailments did not match the Listing's requirements because her cervical cancer

had no reoccurrence since 2008, her bowel syndrome did not require feeding via a catheter,

and her pain had no evidence of nerve impairment. (Tr. 1532). Furthermore, Dr. Gaeta opined

that Plaintiff should be able to lift, push, and carry up to 20 pounds, sit for an hour, stand and

walk for up to six hours, and have no environmental, postural, or manipulative restrictions. (Tr.

1533).

On April 6, 2016, ALJ McCormack asked Dr. Gaeta to re-do his evaluation because he did

not cite specific evidence in support of the limitations provided. (Tr. 1540). Dr. Gaeta re-

submitted his answers, citing to the record's evidence that Plaintiff demonstrated no significant

weight loss or loss of functions. (Tr. 1542).

### D. **Plaintiff's Testimony**

#### a. **August 24, 2011 Hearing**

Plaintiff testified in front of ALJ Michael A. Rodriguez that she struggled with doing basic

household chores such as laundry, especially if it required any lifting or climbing stairs. (Tr. 72).

Plaintiff stated she relied on her mother to help with groceries and to drive her son to

appointments. (Tr. 81). Plaintiff also stated she often lacks the strength to finish walking up her

staircase. (Tr. 72-74). Plaintiff testified that she was advised by Dr. Rosenzweig that her chronic

diarrhea would never completely disappear. (Tr. 67-68).

#### b. **March 14, 2016 Hearing**

Plaintiff testified before ALJ Kieran McCormack as part of the second ALJ hearing on

remand. (Tr. 741). Plaintiff testified that she underwent radiation therapy to treat her cervical

cancer, and that the therapy damaged her intestines, bladder, and hips. (Tr. 754, 759). Plaintiff stated that as a result, she had severe chronic diarrhea and that she was unable to control her bowel movements. (Tr. 754, 776-77). Plaintiff testified that the radiation damage to her bladder caused hematuria. (Tr. 754-55). Further, Plaintiff's radiation treatment caused her to have pain in her hips, which forced her to be on pain medication. (Tr. 759, 760). Plaintiff acknowledged that an unintended side effect of her pain medication was that her diarrhea symptoms improved slightly. (Tr. 771, 787).

Plaintiff reported that her diarrhea occurred up to thirteen to fourteen times a day for anywhere from five minutes to forty-five minutes. (Tr. 781). As a result of the bowel issues, Plaintiff feared having accidents in public, which made it extremely difficult for her to leave her home. (Tr. 782). Plaintiff now is forced to wear a diaper if she has to go out in public. (Tr. 755).

E. **Vocational Expert Testimony**

a. **March 14, 2016 Hearing**

At the hearing, ALJ McCormack asked Ms. Erbacher, an experienced vocational expert, to consider a hypothetical individual of the same age, educational and work background, and RFC as Plaintiff. (Tr. 794-95). Ms. Erbacher opined that while such an individual could not perform Plaintiff's past work as a parcel post clerk, she could still perform the more sedentary jobs of call-out operator, addressing clerk, and election clerk. (Tr. 794-95). According to Ms. Erbacher, in the national economy there were 19,084 call-out operator positions, 7,680 addressing clerk positions, and 202,529 election clerk positions. (Tr. 795-96).

When asked whether that same individual could find work if she needed to be off task at least fifteen percent of the work day, Ms. Erbacher testified that then the individual would

be precluded from all work in the national economy because employers consider being unable to work more than fifteen percent of the day as excessive and cause for termination. (Tr. 796).

### b. August 29, 2016 Hearing

At Plaintiff's counsel's request, Ms. Erbacher returned for a second hearing on August 29, 2016 to offer opinions regarding new hypotheticals that Plaintiff believed were more tailored to her particular situation. Ms. Erbacher testified that if Plaintiff needed to take 8-10 bathroom breaks per day, that would likely preclude her from returning to her past relevant work. (Tr. 813). In response, the ALJ then had Ms. Erbacher confirm that there still existed jobs in the national economy that someone with Plaintiff's RFC could perform if breaks were not required. (Tr. 815). When pressed by Plaintiff's counsel, Ms. Erbacher further re-acknowledged that if someone with Plaintiff's RFC had to miss more than fifteen percent of the work day due to breaks, there would then exist no suitable jobs in the national economy. (Tr. 816-17).

## III. Analysis

### A. Applicable Legal Principles

#### a. Standard of Review

A motion for judgment on the pleadings should be granted if the pleadings make it clear that the moving party is entitled to judgment as a matter of law. However, the Court's review of the Commissioner's decision is limited to an inquiry into whether there is substantial evidence to support the findings of the Commissioner and whether the correct legal standards were applied. Substantial evidence is more than a mere scintilla. It only requires the existence of "relevant evidence as a reasonable mind might accept as adequate to support a conclusion," even if there exists contrary evidence. *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004); *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990). This is a "very deferential standard of

review." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012). The Court may not determine *de novo* whether Plaintiff is disabled but must rely on the underlying record.

### b. <u>Determination of Disability</u>

To be awarded disability benefits, the Social Security Act requires that one have the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(3). The ALJ makes this determination through a five-step evaluation process, for which the burden rests on the Plaintiff for the first four steps and only after all four steps are satisfied does the burden then shift to the Commissioner for the final step.

First, the ALJ must determine that Plaintiff is not currently engaged in substantial gainful activity. Second, the ALJ must find that Plaintiff's impairment is so severe that it limits her ability to perform basic work activities. Third, the ALJ must evaluate whether Plaintiff's impairment falls under one of the impairment listings in 20 C.F.R. Pt. 404, Subpart P, Appendix 1 such that she may be presumed to be disabled. Absent that, the ALJ must then determine the claimant's RFC, or her ability to perform physical and mental work activities on a sustained basis. Fourth, the ALJ then evaluates if Plaintiff's RFC allows her to meet the physical and mental demands of her prior employment. If Plaintiff has satisfied all four of these steps, the burden then shifts to the Commissioner to prove that based on Plaintiff's RFC, age, education, and past work experience, that Plaintiff is capable of performing some other work that exists in the national economy.

**B.  ALJ's Decision**

ALJ Kieran McCormack issued an unfavorable decision for Plaintiff after applying the five-step process. At step two, ALJ McCormack found only four of Plaintiff's alleged impairments rose to the requisite level of severity: cervical cancer, diarrhea secondary to radiation, cervical radiculitis, lumbar radiculopathy, and bilateral hip pain. (Tr. 720). Plaintiff's diverticulitis, post right hemicolectomy, asthma, fibromyalgia, and ileum removal were not severe impairments due to their only imposing a minimal limitation on Plaintiff's activities. (Tr. 720-21). Additionally, ALJ McCormack determined that Plaintiff's psychiatric impairments did not have the requisite severity after analyzing the four broad function areas set out in the disability regulations for evaluating mental disorders. (Tr. 721-22).

At step three, ALJ McCormack found that Plaintiff's severe impairments did not meet the criteria of any of the Listings such that she would be found presumptively disabled. (Tr. 722). Rather than compare the Listings with Plaintiff's impairments, ALJ McCormack relied primarily on the opinion of his designated medical expert, Dr. Joseph Gaeta, who provided the opinion that Plaintiff's impairments do not meet the Listings. (Tr. 726). ALJ McCormack then found that Plaintiff had the RFC to perform light work, referencing the various physicians' opinions and concluding that the prescribed treatment appeared to alleviate Plaintiff's symptoms. (Tr. 723, 726). In addition, ALJ McCormack relied heavily on Dr. Gaeta's responses, which stated that outside of climbing ladders or scaffolds, Plaintiff had no significant limitation on physical movement. *Id*. In contrast, ALJ McCormack disregarded Dr. Bodack's report that Plaintiff "remained fully disabled and could not work," finding such comments a legal conclusion outside the realm of a physician's authority. (Tr. 727).

At step four, ALJ McCormack concluded that, because Plaintiff is limited to light work, Plaintiff is unable to perform her past work at the warehouse, which required heavy labor. *Id*. ALJ McCormack then proceeded to step five and concluded that Plaintiff could perform certain other jobs in the national economy. (Tr. 728). This conclusion was based upon ALJ McCormack's finding that Plaintiff's RFC permitted her to engage in light work. *Id*. ALJ McCormack did not cite the hypothetical posed to the vocational expert regarding the availability of jobs for one who requires multiple untimed breaks throughout the day. As a result, Plaintiff was deemed "not disabled" for purposes of SSI and DIB.

**C.** <u>**Analysis of ALJ's Decision**</u>

Plaintiff argues that ALJ McCormack erred in (1) failing to provide sufficient reasons why the opinion of Plaintiff's treating physician was not given controlling weight, (2) improperly assessing Plaintiff's credibility, (3) failing to provide substantial evidence in support of the RFC assessment, and (4) finding Plaintiff not disabled at Step 5 without substantial evidence. (Plaintiff Mem. Of Law in Support of Mot. for Judgment on the Pleadings (ECF 15) ("Pl. Mem.") at 18). The Commissioner in turn argues that ALJ McCormack applied the correct legal standards and that his decision is supported by substantial evidence. (Def. Mem. In Support of Comm'rs Cross-Mot. for Judgment on the Pleadings (ECF 20) ("Def. Mem.") at 1).

a. **Treating Physician Rule**[20]

Remand is warranted here because ALJ McCormack based his decision primarily on the opinions of two non-treating physicians to the exclusion of Plaintiff's treating physicians. Under the "treating physician rule," a treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in . . . [the] record." 20 C.F.R. § 404.1527(c)(2); *see also Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); *Diaz v. Shalala*, 59 F.3d 307, 313 n.6 (2d Cir. 1995); *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993). A treating physician is defined by the regulations as one who has had an "ongoing treatment relationship" with the patient. 20 C.F.R. § 404.1527(a)(2).

"[G]ood reasons" must be given for declining to afford a treating physician's opinion controlling weight. 20 C.F.R. § 404.1527(c)(2); *Schisler*, 3 F.3d at 568; *Burris v. Chater*, No. 94-CV-8049 (SHS), 1996 WL 148345, at *4 n.3 (S.D.N.Y. Apr. 2, 1996). The Second Circuit warned that it "do[es] not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion." *Halloran*, 362 F.3d at 33; *accord Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015).

Before an ALJ can give a treating physician's opinion less than controlling weight, the ALJ must consider various factors to determine the amount of weight the opinion should be given. These factors include: (1) the length of the treatment relationship and the frequency of

---

[20] Although not relevant here, the Court notes that the regulations governing the "treating physician rule" recently changed as to claims filed on or after March 27, 2017. *See* 20 C.F.R. §§ 404.1527, 404.1520c; Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 F.R. 5844-01, 2017 WL 168819, at *5844, *5867-68 (Jan. 18, 2017); a*ccord Cortese v. Comm'r of Social Sec.*, No. 16-CV-4217 (RJS), 2017 WL 4311133, at *3 n.2 (S.D.N.Y. Sept. 27, 2017).

examination; (2) the nature and extent of the treatment relationship; (3) the medical support for the treating physician's opinion; (4) the consistency of the opinion with the record as a whole; (5) the physician's level of specialization in the area; and (6) other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527 (c) (2)-(6); *Schisler*, 3 F.3d at 567; *Mitchell v. Astrue*, No. 07-CV-285 (JSR), 2009 WL 3096717, at *16 (S.D.N.Y. Sept. 28, 2009); *Matovic v. Chater*, No. 94-CV-2296 (LMM), 1996 WL 11791, at *4 (S.D.N.Y. Jan. 12, 1996).

In his decision, ALJ McCormack failed to justify giving Dr. Gaeta's and Dr. Malhotra's opinions "significant weight" while attributing limited weight to the opinions of Plaintiff's treating physicians. (*See* Tr. 726-27). "Opinion evidence from non-examining sources and non-treating physician examiners typically should not weigh more heavily than that of a treating source." *McClinton v. Colvin*, No. 13-CV-8904 (CM) (MHD), 2015 WL 5157029, at *27 (S.D.N.Y. Sept. 2, 2015), *adopted by* 2015 WL 6117633 (S.D.N.Y. Oct. 16, 2015); *see also Selian v. Astrue*, 708 F.3d 409, 419 (2d Cir. 2013) (remanding after ALJ credited a single consultative exam over treating physician's opinion). However, ALJ McCormack did just that. Dr. Gaeta based his opinion solely on a review of Plaintiff's medical record and without examining Plaintiff even once. (Tr. 1545). Despite that limitation, ALJ McCormack's only stated rationale for his reliance was that Dr. Gaeta provided citations to the record. (Tr. 727, 1545). Similarly, ALJ McCormack provides no justification for attributing significant weight to Dr. Malhotra, who was not Plaintiff's treating physician but rather a consultative examiner. (Tr. 647-51).

In contrast, ALJ McCormack references the test results and opinions from Plaintiff's treating physicians but provides no reason why they were ignored in favor of Dr. Gaeta's and Dr. Malhotra's opinions. ALJ McCormack failed to show how the opinions of treating physicians,

such as Dr. Morrissey or Dr. Badock, who examined Plaintiff multiple times were inconsistent with substantial medical evidence on record such that their opinions should be given limited weight. The lack of reasoning for ignoring Plaintiff's treating physicians falls short of the "good reasons" required and necessitates a remand to the Commissioner for a proper evaluation of Plaintiff's treating physicians' opinions and determining the proper weight to grant them.

### b. Plaintiff's Credibility

Although ALJ McCormack pointed to the record in assessing Plaintiff's subjective credibility as to her physical and mental capabilities, ALJ McCormack's decision does not engage in an evaluation as to the credibility of Plaintiff's complaints regarding the pain and discomfort caused by radiation damage. Subjective testimony regarding pain can still form the basis of finding a disability. *Calzada v. Astrue*, 753 F. Supp. 2d 250, 280 (S.D.N.Y. 2010). Where the objective evidence on the record on its own does not support the claimed symptoms, the ALJ must consider seven symptom-related factors:

> (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.

*Sanchez v. Astrue*, No. 07-CV-9318 (DAB), 2010 WL 101501, at *13 (quoting *Gittens v. Astrue*, No. 07-CV-1397 (GAY), 2008 WL 2787723, at *4 (S.D.N.Y. June 23, 2008)). If the ALJ rejects Plaintiff's testimony as not credible, he must explain such rejection "with sufficient specificity to enable the reviewing Court to decide whether there are legitimate reasons for the ALJ's disbelief." *Calzada*, 753 F. Supp. 2d at 280 (quoting *Fox v. Astrue*, No. 6:05-CV-1599 (NAM/DRH), 2008 WL 828078, at *12 (N.D.N.Y. Mar. 26, 2008)).

Assuming that ALJ McCormack did not consider the objective evidence to support Plaintiff's claimed symptoms, he was then required to assess Plaintiff's testimony in accordance with the seven factors listed above. However, ALJ McCormack made no reference to the seven factors in relation to Plaintiff's pain and discomfort. ALJ McCormack notes Plaintiff's claims of "stabbing" pain in her abdomen and upper back pain, but provides no evaluation of Plaintiff's credibility regarding these claims of pain and consequent limitations. (Tr. 755).

c. **Substantial Evidence for RFC**

Although ALJ McCormack found Plaintiff's diarrhea to be a severe impairment, he failed to include the impact of Plaintiff's gastrointestinal issues in Plaintiff's RFC. This case had been previously remanded for similar deficiencies in ALJ Rodriguez's decision. The Appeals Council had subsequently directed ALJ McCormack to obtain updated records from Plaintiff's treating gastroenterologist Dr. Rosenzweig after finding that ALJ Rodriguez's failure to discuss Plaintiff's frequent bowel movements and the lack of more recent medical evidence on the diarrhea was "problematic." (Tr. 843). This is in addition to the ALJ's general duty to compile the necessary medical records. 20 C.F.R. § 404.1512(b); *Roman v. Colvin*, No. 13-CV-7284 (KBF), 2015 WL 4643136, at *14 (S.D.N.Y. Aug. 4, 2015).

Even though ALJ McCormack should have developed the medical record to substantiate Plaintiff's subjective complaints, as directed to by the Appeals Council, ALJ McCormack relies on the same evidence found to be inadequate in ALJ Rodriguez's decision. There is no indication that ALJ McCormack attempted to procure additional opinions or records from Dr. Rosenzweig. The only additional evidence that ALJ McCormack relied upon were the interrogatory responses from Dr. Gaeta regarding Plaintiff's exertional capacity, which were the product only of Dr.

Gaeta's reviewing Plaintiff's record. (Tr. 717). However, "[t]he opinion of a consulting doctor who simply reviewed the medical data is not an adequate substitute for the opinion of a physician who has been able to observe the claimant over a period of time." *Oliveras ex rel. Gonzalez v. Astrue*, No. 07-CV-2841 (RMB) (JCF), 2008 WL 2262618, at *7 (S.D.N.Y. May 30, 2008), *adopted by* 2008 WL 2540816 (S.D.N.Y. June 25, 2008).

ALJ McCormack's decision thus failed to cure the inadequate discussion of Plaintiff's gastrointestinal issues. As ALJ McCormack notes, even though Plaintiff reported initial improvement, she continued to visit doctors over the next year for complaints of diarrhea. (Tr. 724-25). ALJ McCormack further cited Plaintiff's testimony that she has severe and chronic diarrhea, which limited her ability to travel far from home. (Tr. 724). ALJ McCormack also elicited testimony from Plaintiff at the March 14, 2016 hearing that Plaintiff sometimes needs to use the bathroom six to eight times in a two-hour period. (Tr. 755). However, ALJ McCormack does not reference any of these limitations in explaining his RFC determination, instead only citing to Plaintiff's ability to sit, stand, pull, and lift. (Tr. 726-77).

Remand is therefore warranted for the Commissioner to fully discuss and evaluate Plaintiff's diarrhea symptoms and any such consequent limitations on Plaintiff's RFC. ALJ McCormack's failure to do so in the first instance constitutes a lack of substantial evidence to support his RFC determination.

### d. Substantial Evidence for Vocational Assessment

Relatedly, ALJ McCormack fails to explain his ignoring the vocational expert's testimony that with the bathroom-break limitations described by Plaintiff, no suitable job exists in the national economy. ALJ McCormack proffered a hypothetical to the vocational expert which

contemplated an applicant needing to take at least fifteen percent of the work day off for breaks, to which the expert replied that such a limitation "would preclude all work." (Tr. 796). However, in his decision, ALJ McCormack makes no mention of this testimony. Instead, ALJ McCormack only cites the vocational expert's testimony on the number of sedentary jobs available in the national economy, without explaining his decision as to why he selectively ignored the fifteen-percent work-day break hypothetical. This omission is remarkable considering that Plaintiff's diarrhea may result in Plaintiff requiring at least fifteen percent of the workday off for bathroom breaks at unpredictable times, which presumably is why ALJ McCormack questioned the vocational expert as to this hypothetical. Therefore, ALJ McCormack's vocational assessment cannot be considered as supported by substantial evidence. Upon remand, the Commissioner shall engage in discussion of whether there exist jobs in the national economy that account for Plaintiff's limitations caused by her severe diarrhea.

**IV. <u>Conclusion</u>**

For the foregoing reasons, the Commissioner's Motion for Judgment on the Pleadings is **DENIED**, and Plaintiff's Motion for Judgment on the Pleadings is **GRANTED** to the extent that the case is remanded to the Commissioner pursuant to 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

The Clerk of Court is directed to close the motions at ECF 14 and ECF 19 and to close the case.

**SO ORDERED**.


_____s/ Ona T. Wang_____

Dated: April 1, 2019                                          **Ona T. Wang**
      New York, New York                        United States Magistrate Judge